ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
KEVIN A. SEELY (199982)
ASHLEY R. PALMER (246602)
LEONID KANDINOV (279650)
600 B Street, Suite 1900
San Diego, CA  92101
Tel: 619/525-3990
619/525-3991 (fax)
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
apalmer@robbinsarroyo.com
lkandinov@robbinsarroyo.com

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS LEWIS, on Behalf of Himself and All Others Similarly Situated,<br><br>  Plaintiff,<br><br>v.<br><br>SCOTTRADE, INC.,<br><br>  Defendant. | Case No.: **'14CV2926 JLS  BLM**<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Nicholas Lewis ("Plaintiff") brings this action on behalf of himself and all others similarly situated (the "Class") against defendant Scottrade, Inc. ("Scottrade" or "Defendant"), and states:

## NATURE OF THE ACTION

1. This class action lawsuit seeks redress for Scottrade's breach of its duty of "best execution" when routing a specific type of investment trade for execution on behalf of its customers, known as a "non-directed, standing limit order." Scottrade is a brokerage firm that executes orders for stock and other investment trades on behalf of its clients. As part of providing trade execution services, it routes trades to trading venues that effectuate the purchase or sale of the equity. Scottrade selects the trading venues that it wants to execute its customers' trades. Nearly all of the trading venues Scottrade selects pay Scottrade kickbacks for sending it trades to execute. As detailed below, Scottrade's automated, non-discretionary routing policy and practice is to direct customer orders to the trading venues that pay Scottrade the largest kickbacks rather than the trading venues that will fulfill Scottrade's duty of best execution. This policy and practice violates Scottrade's duty of best execution, constituting a breach of Scottrade's fiduciary duty to the Class. This action seeks to end this practice by foreclosing Scottrade's consideration of kickbacks in deciding where to send trades and to disgorge the money Scottrade wrongfully obtained as a result of its breach.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 Class members and many members of the Class are citizens of states different from Scottrade. Further, greater than two-thirds of the Class members reside in states other than the state in which Defendant is a citizen.

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391 and 18 U.S.C. §1965 because many of the acts and transactions giving rise to this action occurred in this District and because Defendant:

(a) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District;

(b) does substantial business in this District; and

(c) is subject to personal jurisdiction in this District.

4. This Court has personal jurisdiction over Defendant because Defendant is an entity with sufficient minimum contacts with this District so as to render the Court's exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

## PARTIES

5. Plaintiff Nicholas Lewis resides in San Diego, California. Plaintiff has been a client of Scottrade since August 2012. Plaintiff placed non-directed, standing limit orders with Scottrade in the past, and plans to do so in the future. Plaintiff has been and will continue to be subject to Scottrade's improper practices arising out of the non-directed, standing limit orders he makes. As a result of Scottrade's improper practices described herein, Scottrade has breached its fiduciary duties, including the duty of best execution in connection with Plaintiff's non-directed, standing limit orders.

6. Defendant Scottrade is an Arizona corporation and a wholly-owned subsidiary of Scottrade Financial Services, Inc. with principal executive offices located at 700 Maryville Centre Drive, St Louis, Missouri. Defendant Scottrade was founded in 1980 as Scottsdale Securities and was renamed Scottrade, Inc. in 2000. Defendant Scottrade is a discount brokerage firm that provides investment products and services, online trading platforms, and market research tools through over 500 branches in the United States. Defendant Scottrade opened its first

1  California branch in 1990 and has since expanded to a total of seventy-seven
2  branches throughout the state.

### BACKGROUND REGARDING THE MAKER-TAKER MODEL

4  7. Brokers, such as Scottrade, have a significant number of venues
5  from which to choose when deciding where to route their client orders for
6  execution. Regardless of the exchange on which a stock is listed, stocks can be
7  traded at a number of different trading venues, such as one of the major
8  exchanges (e.g., New York Stock Exchange ("NYSE"), the NASDAQ Stock
9  Market ("NASDAQ") or Direct Edge ECN, LLC ("Direct Edge")), hedge funds
10 (e.g., Citadel LLC), banks (e.g., Citigroup Inc. and UBS AG), electronic
11 communications networks, and third-party market makers that hold shares of
12 securities in their own inventory to create a market for both buyers and sellers of
13 those securities. There are approximately thirteen public exchanges, plus over
14 forty additional trading venues.

15 8. Kickbacks arise under a system referred to as the "maker-taker"
16 model. Under the "maker-taker" arrangement, trading venues pay brokers a
17 "rebate" when brokers send or "make" a standing limit buy or sell order to the
18 trading venue, and charge an access or "taker" fee to the brokers that "take" the
19 order. These "make" order "rebates" are kickbacks. Different trading venues pay
20 kickbacks in differing amounts or none at all. By maximizing maker kickbacks
21 and minimizing taker fees by sending orders to a particular trading venue, brokers
22 can add tens of millions of dollars to their bottom lines.

23 9. Unlike some brokers, Scottrade does not pass on these lucrative
24 kickbacks that it receives for routing the orders of Plaintiff and Class members to
25 particular trading venues.

26 10. Market experts acknowledge that the maker-taker system sets up
27 financial incentives that can cause brokers to act to the detriment of their retail
28 investor clients. In November 2013, RBC Capital Markets Corporation ("RBC

1  Capital Markets") wrote the U.S. Securities and Exchange Commission ("SEC")
2  to explain that "maker/taker pricing has compromised efficiency and liquidity,
3  predominantly by incentivizing some market participants to trade primarily, if not
4  solely, to profit from collecting rebates."  RBC Capital Markets also stated:
5  "maker/taker implicates a conflict of interest between brokers and clients.  The
6  conflict manifests by incentivizing brokers to use routing that may be most cost-
7  effective for them, but which may not be the best method of execution for their
8  clients."

9      11.    Similarly, BlackRock, Inc., the world's largest money manager,
10 wrote in an April 2014 white paper that "[a]chieving best execution for clients
11 should be the sole objective in order handling practices," but the maker-taker
12 rebate/fee models "significantly influence the order handling and routing practices
13 of broker-dealers … [which], in turn creates a potential conflict of interest for
14 brokers."

15     12.    Jeffrey Sprecher, Chief Executive Officer ("CEO") of
16 Intercontinental Exchange Inc., which now owns the NYSE, has argued for the
17 elimination of the maker-taker payment method: "I don't like the idea that you pay
18 people to trade – I don't think that it should be done…. I don't think it should be
19 legal.  It puts wrong incentives in the market."

## SCOTTRADE'S DUTY OF BEST EXECUTION

21     13.    Scottrade has a duty of fair dealing, a duty to use reasonable
22 diligence to ascertain the best market, and a duty of best execution in buying and
23 selling stocks, bonds, options, and other assets on behalf of its clients.

24     14.    The duty of best execution predates federal securities laws, and is
25 rooted in common law agency principles of undivided loyalty and reasonable
26 care.  In all instances, best execution requires the broker to put the interests of its
27 customers ahead of its own and to use reasonable diligence so that the resultant
28 price to the customer is as favorable as possible.

15. When delivering best execution for non-directed, standing limit orders, brokers, including Scottrade, must take into account any material differences in execution quality (i.e., the likelihood of execution, speed of execution, and price improvement opportunity) among different venues.

16. Delivering best execution is fundamental to market integrity and to the delivery of good outcomes for investors who rely on agents to act in their best interests. Pursuant to best execution, brokers are required to use reasonable diligence to ascertain the best trading venue so that the resultant price to the customer is as favorable as possible. Brokers, such as Scottrade, are not permitted to allow kickbacks, such as rebate payment inducements, to interfere with their duty of best execution.

17. Scottrade's duty of best execution does not require individualized, trade by trade determinations where to send each trade for execution. Instead, Scottrade may properly make best execution determinations for types of trades that permit trade execution determinations in the aggregate. Nonetheless, Scottrade's aggregate determination must adhere to its duty of best execution and it is not permitted to put its interests ahead of its clients. Although Scottrade makes trade execution determinations in the aggregate, it puts its interests ahead of its clients.

## SCOTTRADE'S CONDUCT

18. Scottrade acts in derogation of the fiduciary duties owed to its customers by failing to provide best execution for their orders. In breach of its duty of best execution and in violation of applicable law, Scottrade directs large blocks of its clients' trade orders to the pre-determined trading venues where Scottrade will maximize kickback revenue.

19. Scottrade utilizes a computerized system called "Smart Order Router" to direct standing limit order flow to pre-determined trading venues. In accordance with this computerized system, individual customer orders are routed

5
CLASS ACTION COMPLAINT

based on an aggregate order-handling policy and practice that has been pre-set for large blocks of trades. Scottrade's computerized system has the ability to separate market and limit order flow, as well as marketable and standing orders.

20. The Rule 606 Reports Scottrade filed with the SEC further confirm that Scottrade routes almost all of its clients' orders to only a few trading venues that each pay Scottrade large kickbacks. For example, in the third quarter of 2014, Scottrade routed over 77% of standing limit orders for NYSE-listed securities to trading venues Direct Edge and Nasdaq Execution Services ("Nasdaq"):

Securities Listed on New York Stock Exchange Euronext

| Route Venues | Total (%) | Market (%) | Limit (%) | Other (%) |
|---|---|---|---|---|
| Total (%) | 100 | 21 | 25 | 54 |
| Citadel Securities | 22.72 | 36.24 | 7.25 | 24.88 |
| KCG Americas LLC | 22.68 | 23.09 | 8.08 | 29.39 |
| DirectEdge ECN (EDGX) | 15.85 | 0.00 | 41.45 | 9.81 |
| Nasdaq Execution Services | 13.93 | 0.00 | 35.89 | 8.87 |
| Citigroup Global Markets | 11.22 | 17.70 | 3.47 | 12.42 |
| G1 Execution Services | 7.23 | 12.97 | 2.22 | 7.42 |

100.00% of total customer orders were non-directed orders.

21. Similarly, in the third quarter of 2014, Scottrade routed over 80% of standing limit orders for NASDAQ-listed securities to trading venues Direct Edge and Nasdaq:

Securities Listed on The Nasdaq Stock Market

| Route Venues | Total (%) | Market (%) | Limit (%) | Other (%) |
|---|---|---|---|---|
| Total (%) | 100 | 21 | 29 | 50 |
| Citadel Securities | 25.82 | 43.29 | 7.36 | 29.34 |
| KCG Americas LLC | 24.94 | 28.99 | 6.81 | 33.95 |
| DirectEdge ECN (EDGX) | 17.01 | 0.00 | 40.69 | 10.19 |
| Nasdaq Execution Services | 16.39 | 0.00 | 40.18 | 9.24 |
| Citigroup Global Markets | 6.33 | 10.57 | 1.95 | 7.13 |
| G1 Execution Services | 5.64 | 10.77 | 1.84 | 5.71 |

100.00% of total customer orders were non-directed orders.

22.     Despite routing more of its clients' limit orders to Direct Edge and Nasdaq than to any other venue in the third quarter of 2014, Scottrade did not route a single market order to Direct Edge or Nasdaq, which do not pay maker kickbacks for executing market orders.

23.     In the second quarter of 2014, Direct Edge and Nasdaq received nearly 77% of Scottrade's total limit orders for NYSE-listed securities and over 80% of Scottrade's total limit orders for NASDAQ-listed securities.  Direct Edge and Nasdaq received more of Scottrade's clients' limit orders than any other venue in the second quarter, but none of Scottrade's market orders because Direct Edge and Nasdaq paid the largest kickbacks for limit orders, but not market orders:

Securities Listed on New York Stock Exchange Euronext

| Route Venues | Total (%) | Market (%) | Limit (%) | Other (%) |
|---|---|---|---|---|
| Total (%) | 100 | 21 | 26 | 53 |
| Citadel Securities | 25.41 | 39.46 | 7.60 | 28.84 |
| KCG Americas LLC | 20.23 | 24.10 | 4.64 | 26.50 |
| DirectEdge ECN (EDGX) | 16.89 | 0.00 | 42.32 | 10.76 |
| Nasdaq Execution Services | 14.35 | 0.00 | 36.44 | 8.90 |
| Citigroup Global Markets | 12.28 | 20.02 | 3.84 | 13.48 |
| G1 Execution Services | 6.87 | 10.20 | 3.79 | 7.12 |

100.00% of total customer orders were non-directed orders.

Securities Listed on The Nasdaq Stock Market

| Route Venues | Total (%) | Market (%) | Limit (%) | Other (%) |
|---|---|---|---|---|
| Total (%) | 100 | 20 | 30 | 50 |
| Citadel Securities | 28.29 | 49.81 | 8.82 | 31.45 |
| KCG Americas LLC | 24.67 | 26.73 | 6.87 | 34.54 |
| Nasdaq Execution Services | 17.67 | 0.00 | 42.31 | 9.87 |
| DirectEdge ECN (EDGX) | 16.09 | 0.00 | 37.78 | 9.44 |
| Citigroup Global Markets | 6.70 | 12.28 | 2.27 | 7.15 |

100.00% of total customer orders were non-directed orders.

24.     In the first quarter of 2014, Direct Edge and Nasdaq received over 80% of Scottrade's total limit orders for NYSE-listed securities and over 82% of Scottrade's total limit orders for NASDAQ-listed securities.  Direct Edge and

Nasdaq received more of Scottrade's clients' limit orders than any other venue in the first quarter, but none of Scottrade's market orders because Direct Edge and Nasdaq paid the largest kickbacks for limit orders, but not market orders:

Securities Listed on New York Stock Exchange Euronext

| Route Venues | Total (%) | Market (%) | Limit (%) | Other (%) |
|---|---|---|---|---|
| Total (%) | 100 | 21 | 26 | 53 |
| Citadel Securities | 23.78 | 36.82 | 7.15 | 26.81 |
| KCG Americas LLC | 22.76 | 27.03 | 5.18 | 29.78 |
| DirectEdge ECN (EDGX) | 15.82 | 0.00 | 40.65 | 9.82 |
| Nasdaq Execution Services | 15.43 | 0.00 | 40.29 | 9.26 |
| Citigroup Global Markets | 13.65 | 22.35 | 4.16 | 14.89 |
| G1 Execution Services | 5.91 | 9.59 | 1.80 | 6.48 |

100.00% of total customer orders were non-directed orders.

Securities Listed on The Nasdaq Stock Market

| Route Venues | Total (%) | Market (%) | Limit (%) | Other (%) |
|---|---|---|---|---|
| Total (%) | 100 | 21 | 30 | 50 |
| Citadel Securities | 27.05 | 47.44 | 7.79 | 30.05 |
| KCG Americas LLC | 22.95 | 24.09 | 5.28 | 33.01 |
| Nasdaq Execution Services | 17.62 | 0.00 | 42.66 | 10.03 |
| DirectEdge ECN (EDGX) | 16.36 | 0.00 | 39.39 | 9.43 |
| Citigroup Global Markets | 10.28 | 19.60 | 3.41 | 10.51 |

100.00% of total customer orders were non-directed orders.

25. Likewise, in the fourth quarter of 2013, Direct Edge and Nasdaq received over 65% of Scottrade's total limit orders for NYSE-listed securities and over 71% of Scottrade's total limit orders for NASDAQ-listed securities. Direct Edge and Nasdaq received more of Scottrade's clients' limit orders than any other venue in the fourth quarter, but none of Scottrade's market orders because Direct Edge and Nasdaq paid the largest kickbacks for limit orders, but not market orders:

**Securities Listed on New York Stock Exchange Euronext**

| Route Venues | Total (%) | Market (%) | Limit (%) | Other (%) |
|---|---|---|---|---|
| Total (%) | 100 | 22 | 27 | 51 |
| Knight Capital Americas | 23.59 | 29.46 | 6.04 | 30.40 |
| Citadel Derivatives Group | 21.52 | 32.61 | 7.29 | 24.40 |
| Nasdaq Execution Services | 17.38 | 0.00 | 43.52 | 10.84 |
| Citigroup Global Markets | 13.80 | 22.63 | 4.19 | 15.17 |
| DirectEdge ECN (EDGX) | 9.30 | 0.00 | 21.72 | 6.63 |
| G1 Execution Services | 6.68 | 11.12 | 2.18 | 7.20 |
| LAVAFLOW, INC. | 5.41 | 0.00 | 14.23 | 3.01 |

100.00% of total customer orders were non-directed orders.

**Securities Listed on The Nasdaq Stock Market**

| Route Venues | Total (%) | Market (%) | Limit (%) | Other (%) |
|---|---|---|---|---|
| Total (%) | 100 | 21 | 30 | 49 |
| Knight Capital Americas | 26.80 | 30.50 | 6.67 | 37.43 |
| Citadel Derivatives Group | 23.51 | 41.79 | 6.65 | 26.06 |
| DirectEdge ECN (EDGX) | 19.86 | 0.00 | 47.08 | 11.71 |
| Nasdaq Execution Services | 10.41 | 0.00 | 24.73 | 6.09 |
| Citigroup Global Markets | 10.10 | 18.93 | 3.35 | 10.48 |
| LAVAFLOW, INC. | 4.15 | 0.00 | 10.06 | 2.31 |

100.00% of total customer orders were non-directed orders.

26. Based on the rebate kickbacks disclosed in the SEC Rule 606 Reports, Scottrade has made significant profits from its improper order routing practices. However, Scottrade has not publicly disclosed this total amount. Notably, the amounts Scottrade has earned from its improper order routing practices are in addition to the commissions paid by Scottrade's clients for its retail brokerage services.

27. Studies conducted by Professors Robert H. Battalio, Shane A. Corwin, and Robert Jennings from the Mendoza College of Business at the University of Notre Dame and the Kelley School of Business at Indiana University (the "Battalio Research"), into the order routing practices of Scottrade and other brokers, provides further evidence that non-directed, standing limit order routing decisions made pursuant to kickback arrangements typically provide inferior execution relative to other trading venues. The Battalio Research found

that "[f]our sample brokers, Ameritrade, E*Trade, Fidelity, and Scottrade, route orders in a way that suggests a focus on liquidity rebates." Consistent with the Battalio Research, limit orders routed to the trading venues offering higher kickbacks fill slower and less often than similar orders routed to trading venues offering lower kickbacks. When brokers like Scottrade implemented programs designed to maximize their own profits through maximizing kickbacks, client orders were routed to venues where the orders were up to 25% less likely to be executed.

28. There is a high correlation between the level of a trading venue's taker fee and its maker rebate. Thus, trading venues such as Direct Edge and Nasdaq, which offer a high kickback in the form of a rebate, also charge a high taker fee. The Battalio Research found that when identical orders were routed to two venues at the same time, the venue offering lower kickbacks was more likely to fill the limit order, and – in instances where both venues filled the order – was far more likely to fill the order more quickly.

29. Further, the Battalio Research analyzed market order execution across multiple venues when each of the venues was at the best price. The Battalio Research found that the data supported previous academic work finding that fees influenced the routing of orders to venues charging the lowest taker fee (i.e., venues unlike Direct Edge and Nasdaq). In such instances, the limit order queue line for the venues offering the highest taker fee (and correspondingly, the highest kickback) was two to three times as long as the queue line for the venues charging the lowest taker fee and offering the lowest kickback. This explains why limit orders routed to the trading venues paying the highest kickbacks take longer to be filled than limit orders routed to the trading venues paying the lowest kickbacks. According to Professor Battalio, "the decision to route all limit orders to a single venue paying the maximum rebate, (and, correspondingly charging the

maximum take fee), is inconsistent with a broker's responsibility to obtain best execution."

30.  Finally, as reiterated in his written Senate testimony, Professor Battalio and his co-authors also concluded that limit orders sent to the trading venues with the highest taker fees (i.e., Direct Edge and Nasdaq) will have lower fill rates and trade when the market price is becoming worse for the customer:

> All else equal, when two venues offer the best price, one expects liquidity demanders arriving in the marketplace to first route their orders to the venue with the lower take fee. Consider the case where two exchanges are at the national best bid. If sufficient selling demand arrives, sellers exhaust liquidity by walking down both exchange's limit order books. In this situation, limit order traders who purchase shares at the bid price suffer a short-term loss. However, if the stock price rises before liquidity is exhausted at the national best bid, limit orders on the venue with the higher take fee (and thus, the higher make rebate) can become isolated and miss profitable trading opportunities. Thus, on average, we expect that limit orders sent to venues with high take fees will have lower fill rates and suffer greater adverse selection costs – they are more likely to trade when the price moves against them and less likely to trade when prices move in their favor. This suggests that brokers routing limit orders to venues with the highest take fees (and make rebates) may not be obtaining best execution for their clients.

31.  The Battalio Research demonstrates an impact of limit order routing decisions on limit order execution quality, such that "routing decisions based primarily on rebates/fees appear to be inconsistent with best execution."

32.  This action does not contend that maker kickbacks are per se unlawful or improper or that compensation for a maker rebate for a particular trade means the broker receiving the rebate violated best execution. This action also does not challenge Scottrade's disclosure of maker kickbacks.

## CLASS ACTION ALLEGATIONS

33.  Plaintiff brings this case as a class action pursuant to Rules 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure. The proposed Class

consists of all persons who placed a non-directed, standing limit order with Scottrade that was executed until the date notice is disseminated to the Class.

34. The Class excludes Scottrade's officers and directors, current or former employees, as well as their immediate family members.

35. ***Numerosity***. The members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains thousands of members. While the precise number of Class members is unknown to Plaintiff, it is known to Defendant.

36. ***Existence and Predominance of Common Questions of Law and Fact.*** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. All members of the Class have been subject to the same conduct and their claims arise from the same legal claims. The common legal and factual questions include, but are not limited to, the following:

(a) whether Scottrade has a duty of best execution to Plaintiff and members of the Class;

(b) whether Scottrade has an obligation to obtain the most favorable terms reasonably available for the non-directed, standing limit orders placed by Plaintiff and members of the Class;

(c) whether Scottrade has a policy or practice of receiving kickbacks in connection with placing the non-directed, standing limit orders made by Plaintiff and members of the Class;

(d) whether Scottrade's policy or practice of choosing trading venues based on the kickbacks it would receive for the non-directed, standing limit orders made by Plaintiff and members of the Class breached the duty of best execution owed to Plaintiff and members of the Class;

(e) whether Scottrade engaged in unlawful or unfair business practices;

(f) whether the Plaintiff and the Class are entitled to injunctive relief;

(g) whether the Plaintiff and the Class are entitled to declaratory relief;

(h) whether Scottrade has been unjustly enriched by its improper course of action;

(i) whether the commissions and kickbacks in the form of rebates, received by Scottrade in connection with the non-directed, standing limit orders made by Plaintiff and the Class should be disgorged; and

(j) whether Plaintiff and members of the Class are entitled to equitable relief, and the proper measure of that equitable relief.

37. ***Typicality.*** Plaintiff's claims are typical of the claims of the members of the Class in that Plaintiff is a member of the Class that he seeks to represent.

38. ***Adequacy of Representation.*** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in the prosecution of this type of class action litigation. Plaintiff has no adverse or antagonistic interests to those of the Class.

39. ***Superiority.*** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The burden and expense that would be entailed by individual litigation makes it impracticable or impossible for Class members to prosecute their claims

individually. Further, the adjudication of this action presents no unusual management difficulties.

40. Unless a class is certified, Defendant will retain monies received as a result of its improper conduct. Unless a class wide injunction is issued, Defendant will continue to commit the violations alleged, and will continue to violate its duties of best execution in connection with orders placed by members of the Class. Scottrade has acted or refused to act on grounds that are generally applicable to the Class so that injunctive and declaratory relief is appropriate to the Class as a whole.

## COUNT I

### Violations of Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

41. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

42. Plaintiff, on behalf of himself and the Class brings this cause of action pursuant to the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.* (the "MMPA").

43. The MMPA prohibits "[t]he act, use or employment by any person of any … unfair practice … in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.

44. Defendant's brokerage services at issue constituted the sale of "any merchandise in trade or commerce" within the meaning of Mo. Rev. Stat. § 407.010.1.

45. Defendant is a merchant with respect to its sale of brokerage services to Plaintiff and the Class.

46. Plaintiff purchased Defendant's services for personal, family, or household purposes by placing non-directed, standing limit orders with Scottrade.

47. A substantial part of the events giving rise to the violations of law occurred in Missouri.

48. Defendant engaged in unfair acts or practices in violation of the MMPA by failing to ensure that Scottrade's order routing practices complied with its "best execution" responsibilities. These unfair acts or practices are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

49. Such conduct is ongoing and continues to this date.

50. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

51. Defendant's conduct caused and continues to cause substantial injury to Plaintiff and the other Class members. Plaintiff has suffered injury in fact and has lost money as a result of Defendant's unfair conduct.

52. Defendant has thus engaged in unfair business acts and practices, entitling Plaintiff to judgment and equitable relief against Defendant, as set forth in the Prayer for Relief.

53. Additionally, pursuant to Mo. Rev. Stat. § 407.025.1, Plaintiff seeks damages, injunctive relief, attorney's fees, and any other equitable relief as the Court deems necessary or proper.

## COUNT II

### Breach of Fiduciary Duty

54. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

55. Scottrade owed fiduciary duties to Plaintiff and the Class, including duties of best execution.

56. Pursuant to its duty of best execution, Scottrade was required to take into account material differences in execution quality among trading venues,

including using reasonable diligence to ascertain the best trading venue so that the resultant price to Plaintiff and the Class is as favorable as possible. By utilizing the order routing policies and practices described above, which included routing its customers' trades to the trading venues that paid Scottrade kickbacks, Scottrade breached its fiduciary duty owed to Plaintiff and the Class.

57. Scottrade has earned significant, wrongful monies and profits from these material and opportunistic breaches that have also caused the orders made by Plaintiff and the Class to be executed in a manner that did not fulfill best execution. Scottrade's customers have been damaged thereby, in an amount to be determined at trial.

58. As a result of Scottrade's breach of fiduciary duty, Plaintiff and the Class are also entitled to an accounting and injunctive relief prohibiting Scottrade from factoring kickbacks when performing best execution for non-directed, standing limit orders.

## COUNT III

### Unjust Enrichment

59. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60. Scottrade owes a duty of best execution to Plaintiff and the Class. Notwithstanding its duties, Scottrade utilizes a uniform trade routing practice that is not in the best interest of its customers. Scottrade accepts trade commissions from Plaintiff and the Class for their orders, and thereby assumes a duty of best execution. In derogation of its duties, Scottrade routes its customers' orders to the trading venue that is willing to pay Scottrade the most money to receive its non-directed, standing limit order flow.

61. As the intended and expected result of its conscious wrongdoing as set forth in this Complaint, Scottrade has profited and benefited from its improper market selection and order routing practices. Scottrade does not pass on the

1  rebate payments that it receives for routing the orders of Plaintiff and Class
2  members to particular trading venues.
3      62.  By its improper and wrongful conduct described herein, Scottrade
4  was and continues to be unjustly enriched at the expense of Plaintiff and the
5  members of the Class.
6      63.  It would be inequitable for Scottrade to retain the profits, benefits,
7  and other compensation it obtained through its wrongful acts, including the
8  commissions and kickbacks obtained in connection with routing the orders at
9  issue.  Thus, a constructive trust should be imposed on all monies wrongfully
10 obtained by Scottrade.  Plaintiff and the Class are entitled in equity to seek
11 restitution of these wrongful profits, revenues, and benefits to the extent, and in
12 the amount, deemed appropriate by the Court; and such other relief as the Court
13 deems just and proper to remedy Scottrade's unjust enrichment.

## COUNT IV

### Declaratory Relief

16     64.  Plaintiff incorporates by reference and realleges each and every
17 allegation contained above, as though fully set forth herein.
18     65.  A controversy has arisen and now exists between Plaintiff and Class
19 members on the one hand and Scottrade on the other.  The controversy between
20 the parties concerns Scottrade's automated trade-routing policy and practice and
21 its duty of best execution owed in connection with the trade orders it routes on
22 behalf of Plaintiff and the Class.  Plaintiff and Class members contend that by
23 pre-determining where it will automatically route non-directed, standing limit
24 orders in the aggregate based on maximizing the rebate payments it will receive,
25 Scottrade violates its duty of best execution, including because it fails to use
26 reasonable diligence to ascertain the best trading venue so that the resultant price
27 to the customer is as favorable as possible.  Scottrade disputes these contentions
28

and contends that it does not violate its duty of best execution by taking into account potential for rebate payments when routing its customers' orders.

66. Plaintiff requests a judicial determination of his rights and duties, and the rights and duties of absent Class members and a declaration as to whether Scottrade's order routing practice breaches the duty of best execution owed to Plaintiff and Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief in interim orders and by way of entry of final judgment in his favor, in favor of those he seeks to represent, and against Defendant:

A. Certifying this action as a class action and appointing Plaintiff as class representative and his counsel as class counsel;

B. Awarding declaratory and injunctive relief as permitted by law or equity, including a judicial determination of the parties' rights and duties, enjoining Scottrade from continuing the unlawful practices as set forth herein (including the improper order routing practices), imposing a constructive trust on all monies wrongfully obtained by Scottrade, and directing Scottrade to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendant by means of any act or practice declared by this Court to be wrongful;

C. Awarding attorney's fees and costs; and

D. Granting Plaintiff and the Class such other relief as the Court deems just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury of all issues which are subject to adjudication by a trier of fact.

Dated: December 11, 2014

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
KEVIN A. SEELY (199982)
ASHLEY R. PALMER (246602)
LEONID KANDINOV (279650)

By:      /s/ Brian J. Robbins
         BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Tel: 619/525-3990
619/525-3991 (fax)
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
apalmer@robbinsarroyo.com
lkandinov@robbinsarroyo.com

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

Attorneys for Plaintiff

998186